**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAYER HEALTHCARE LLC,<br><br>Plaintiff,<br><br>v.<br><br>SECOND STONE ENTERPRISES LLC, *et al.*,<br><br>Defendants. | Civil Action No. 24-7618 (MAS) (JBD)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Bayer Healthcare LLC's ("Bayer" or "Counterclaim Defendant") Motion to Dismiss (ECF No. 22) Counterclaims of Sigma Deals LLC ("Sigma") and Samuel Schiff ("Schiff") (collectively, "Counterclaim Plaintiffs") (ECF No. 18). Counterclaim Plaintiffs opposed (ECF No. 29), and Counterclaim Defendant replied (ECF No. 32). The Court has carefully considered the parties' submissions and reaches its decision without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons outlined below, Counterclaim Defendant's Motion to Dismiss is granted in part and denied in part.

I.   **BACKGROUND**

    A.   **Factual Background**[1]

Bayer is a Delaware limited liability company. (Countercls. ¶ 5, ECF No. 18.) Bayer owns several U.S. Trademark Registrations relating to Claritin, including: (1) CLARITIN® (U.S.

---

[1] For the purpose of considering the instant motion, the Court accepts all factual allegations underlying the Counterclaims as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

Trademark Reg. Nos. 3,621,772, 3,140,850, 2,816,780, 2,824,753, and 1,498,292); (2) CLARITIN-D® (U.S. Trademark Reg. Nos. 2,819,388 and 1,912,214); and (3) CHILDREN'S CLARITIN® (U.S. Trademark Reg. No. 3,332,199). (*Id.* ¶ 11.) Claritin is a brand name for loratadine, an antihistamine drug for treating seasonal allergy symptoms. (*Id.* ¶ 66.)

Bayer is a vendor and supplier of Claritin products on the Amazon.com marketplace ("Amazon"). (*Id.* ¶ 17.) Bayer controls more than fifty-five percent of the market share of loratadine in the United States. (*Id.* ¶ 68.) The relevant geographic market for purposes of the antitrust claims is the United States. (*Id.* ¶¶ 71-72.)

Sigma, on the other hand, is in the business of acquiring and reselling consumer products on Amazon for profit. (*Id.* ¶¶ 13-14.) A significant portion of Sigma's business derives from selling products on Amazon. (*Id.* ¶ 60.) Before the instant case, Sigma sold Claritin products it had purchased on the open market through its Amazon storefront. (*See id.* ¶¶ 14, 48, 50.) Sigma asserts that it has invested significant efforts in building a successful and reputable Amazon storefront, which has amassed hundreds of positive reviews and a purported near-perfect customer rating. (*Id.* ¶¶ 62-64.)

During the COVID-19 pandemic, more consumers turned to online retailers. (*Id.* ¶ 53.) Sigma contends Amazon is the world's largest online retailer and that it is valued higher than the combined worth of the next eight largest retailers in the United States. (*Id.* ¶¶ 52, 54.) Amazon's online e-commerce platform depends on third parties, such as Sigma, to sell products.[2] (*Id.* ¶¶ 55.) Amazon allows independent third-party sellers, such as Sigma, to set their own prices for products sold on its platform. (*See id.* ¶ 20.) But, for vendors, such as Bayer, it is not the same. (*Id.*

---

[2] During all relevant times, Sigma had a contractual and business relationship with Amazon, which allowed it to sell products on Amazon. (Countercls. ¶ 57.)

2

¶¶ 17-18.) Vendors cannot dictate the prices Amazon charges retail customers. (*See id.*) Rather, Amazon employs an algorithm to dynamically price products on its e-commerce platform for vendors. (*Id.* ¶¶ 18-19.) So, when third parties on Amazon lawfully list Claritin products at prices lower than those set by Amazon, the algorithm will match those lower prices, which requires Bayer to supply Claritin products at lower prices. (*Id.* ¶ 20.)

To avoid lowering the price at which Bayer supplies goods to Amazon, Bayer allegedly devised a scheme to eliminate third-party sellers from Amazon's platform. (*Id.* ¶ 21.) Specifically, Sigma alleges that Bayer filed sham allegations against several Amazon sellers, including Sigma, and attempted to impose rules on the sellers to limit their ability to sell products on Amazon. (*Id.* ¶¶ 23-27.) Sigma contends that, since 2022, Bayer has filed at least four other boilerplate litigations premised on knowingly false claims against third-party sellers.[3] (*Id.* ¶¶ 23-24.)

Based on the above, Sigma contends that it has suffered antitrust injury and will continue to suffer significant competitive harm due to Bayer's litigation, including its inability to sell Claritin products, resulting in: (1) a loss of hundreds of thousands of dollars of sales from not being able to sell product due to current litigation; (2) loss of future sales and profits; and (3) loss of customer goodwill and competitive advantage. (*Id.* ¶¶ 81-84, 101.)

### B.   Procedural Background

Bayer commenced this action on July 8, 2024 against Defendants Second Stone Enterprises LLC, SMI International LLC, Cornerstone Trading Group Inc., Sigma, Schiff, and Miriam

---

[3] Bayer filed the following suits based on similar allegations: *Bayer HealthCare LLC v. Darisi, Inc. et al.*, No. 22-5192 (D.N.J. Aug. 24, 2022); *Bayer HealthCare LLC v. Safegate Int'l-Sgi LLC et al.*, No. 23-1291 (D.N.J. Mar. 8, 2023); *Bayer HealthCare LLC v. FBSquared, LLC et al.*, No. 23-15101 (D.N.J. Sept. 4, 2023); and *Bayer HealthCare LLC v. Kayama Sales LLC et al.*, No. 24-8239 (D.N.J. Aug. 2, 2024). (Countercls. ¶ 23.)

Kleinbart[4] (collectively, "Defendants"). (*See* Compl., ECF No. 1.) In the Complaint, Bayer brings claims against Defendants for engaging in trademark infringement, unfair competition under federal and common law, and tortious interference of a contract. (*See generally id.*)

On September 9, 2024, Counterclaim Plaintiffs filed an Answer, five affirmative defenses, and three counterclaims. (ECF No. 18.) The three counterclaims against Counterclaim Defendant include: (1) violation of the Sherman Act on behalf of Sigma; (2) monopolization under New Jersey State law, N.J. Stat. Ann. §§ 56:9-1 to -19 on behalf of Sigma; and (3) tortious interference with prospective economic advantage on behalf of Schiff (collectively, the "Counterclaims"). (*See* Countercls. ¶¶ 102-32.) On October 15, 2024, Counterclaim Defendant filed a Motion to Dismiss Counterclaim Plaintiffs' Counterclaims. (Countercl. Def.'s Moving Br., ECF No. 22.) Counterclaim Plaintiffs opposed (Countercl. Pls.' Opp'n Br., ECF No. 29), and Counterclaim Defendant replied (Countercl. Def.'s Reply Br., ECF No. 32). The motion is now ripe for review.

## II.   <u>LEGAL STANDARD</u>

Courts evaluate a motion to dismiss a counterclaim under the same standard as a motion to dismiss a complaint. *See, e.g., Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011). A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure[5] 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the

---

[4] According to the Counterclaims, Miriam Kleinbart is also known as "Miriam Schiff." (*See generally* Countercls.)

[5] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state that the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Finally, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### III. DISCUSSION

In moving to dismiss, Counterclaim Defendant argues that Counterclaim Plaintiffs are precluded from asserting the Counterclaims based on the *Noerr-Pennington* doctrine. (*See generally* Countercl. Def.'s Moving Br.) Counterclaim Defendant argues that even if the *Noerr-Pennington* doctrine does not preclude the Counterclaims, Counterclaim Plaintiffs fail to plead the requisite elements for the Counterclaims. (*See id.*)

#### A. *Noerr-Pennington* Doctrine

The Court begins by considering whether the Counterclaims are precluded based on the *Noerr-Pennington* doctrine—a doctrine that places "a First Amendment limitation on the reach of [antitrust]" and tortious interference claims. *See Hanover 3201 Realty, LLC v. Vill. Supermarkets., Inc.*, 806 F.3d 162, 178 (3d Cir. 2015); *see also Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128-29 (3d Cir. 1999) (applying *Noerr-Pennington* immunity to New Jersey state law claims);

*Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159-60 (3d Cir. 1988) (explaining that tortious interference claims are subject to *Noerr-Pennington* immunity).

Counterclaim Plaintiffs allege that Counterclaim Defendant filed sham litigation that allowed it to gain monopoly power in the relevant market and restrain competition, which has caused Counterclaim Plaintiffs economic injury. (Countercls. ¶¶ 103-04, 109, 112.) Counterclaim Defendant argues that Counterclaim Plaintiffs' allegations regarding Counterclaim Defendant's litigation should be dismissed because this activity is protected by the First Amendment's *Noerr-Pennington* immunity. (*See generally* Countercl. Def.'s Moving Br.) Counterclaim Plaintiffs counter that Counterclaim Defendant's litigating conduct is not immunized because it falls within the "sham exception" to *Noerr-Pennington* immunity. (*See generally* Countercl. Pls.' Opp'n Br.)

*Noerr-Pennington* provides immunity from liability to parties who petition the government for redress of their grievances, including courts. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) ("*Noerr*"); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-70 (1965). The immunity is not absolute, however, and a plaintiff can invoke the "sham" litigation exception where a defendant's single petition or litigation is "nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.*; *see also Takeda Pharm. Co. v. Zydus Pharms. (USA) Inc.*, No. 18-1994, 2021 WL 3144897, at *10 (D.N.J. July 26, 2021) (citing *Noerr*, 365 U.S. at 144), *aff'd*, No. 21-2608, 2022 WL 17546949 (3d Cir Dec. 9, 2022)). In other words, a lawsuit "does not qualify for . . . immunity if it 'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 51 (1993) ("*PREI*") (quoting *Noerr*, 365 U.S. at 144).

In determining whether litigation constitutes a mere sham, the Third Circuit has adopted the approach of the Second, Fourth, and Ninth Circuits when applying *California Motor Transportation Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) and *PREI*, 508 U.S. 49. *See Hanover*, 806 F.3d at 180 (finding that the test articulated in *California Motor* is applicable in cases involving a series of filings and the test articulated in *PREI* is applicable in cases involving a single filing). First, the court must determine whether there has been a single filing or a series of filings. *Id.* If there has been just a single filing, there must be "a showing of objective baselessness before looking into the subjective motivations" of the party alleged to have engaged in anti-competitive behavior. *Id.* On the other hand, when faced with a "series or pattern of lawsuits," a more flexible approach is warranted. *Id.* In that scenario, even if some of the petitions turn out to have objective merit, the claimant is not automatically immunized from liability. *Id.*

Instead, the court must determine " whether [the lawsuits] are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* (quoting *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994)). "[T]his inquiry is prospective and asks whether the legal filings were made, 'not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment.'" *Id.* To determine whether a practice of petitioning the government without regard to merit was used, "a court should perform a holistic review that may include looking at the defendant's filing success—i.e., win-loss percentage—as circumstantial evidence of the defendant's subjective motivations." *Id.*; *see also ADP, LLC v. Ultimate Software Grp., Inc.*, No. 16-8664, 2018 WL 1151713, at *3 (D.N.J. Mar. 5, 2018) ("The court is expected to perform a more holistic review that may include looking at the filing success of the claimant, evidence of bad faith, and the

magnitude and nature of the collateral harm caused by the filings as circumstantial evidence of the subjective motivations of the petitioner.").

A court may decide the applicability of the *Noerr-Pennington* doctrine on a motion to dismiss under Rule 12(b)(6) if no factual issues are present. *Trs. of Univ. of Pa. v. St. Jude Child.'s Rsch. Hosp.*, 940 F. Supp. 2d 233, 242-43 (E.D. Pa. 2013) ("To be sure, the question of whether litigation is a sham can be a fact question for the jury. But as the Supreme Court explained in *PRE[I]*, when there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide . . . [*Noerr-Pennington* applicability] as a matter of law." (citations omitted)); *Asphalt Paving Sys. v. Asphalt Maint. Sols., LLC*, No. 12-2370, 2013 WL 1292200, at *7-8 (E.D. Pa. Mar. 28, 2013) (deciding that *Noerr-Pennington* immunity applied in its grant of dismissal); *Bristol-Myers Squibb Co. v. IVAX Corp.*, 77 F. Supp. 2d 606, 616 (D.N.J. 2000) (applying *Noerr-Pennington* immunity as grounds to dismiss a state law counterclaim for unfair competition).

With the relevant test articulated, the Court proceeds to consider the application of the *Noerr-Pennington* doctrine in this case. Here, Counterclaim Plaintiffs assert that Counterclaim Defendant filed its trademark misappropriation suit "with the sole purpose of stifling competition and forcing small business owners to incur litigation costs." (Countercls. ¶ 2.) Counterclaim Plaintiffs allege that Counterclaim Defendant is attempting to dictate the prices that Amazon charges its customers for Claritin. (*See id.* ¶¶ 18-21.) Specifically, Counterclaim Plaintiffs allege that when third-party sellers, such as Counterclaim Plaintiffs, list their product at a lower price, Amazon's algorithm will lower retail prices to match those of third-party sellers. (*See id.*) Amazon will thus demand lower prices from Counterclaim Defendant. (*Id.*) So, to avoid Counterclaim

Defendant having to sell Claritin at a lower price on Amazon,[6] Counterclaim Plaintiffs allege that it hatched a plan to start suing small third-party sellers to keep its products at artificially high prices that do not match the market demand. (*See id.* ¶¶ 21-22, 99.) Counterclaim Plaintiffs allege that such lawsuits constitute "sham litigation." (*Id.* ¶ 22.)

To support their allegations, Counterclaim Plaintiffs list at least four examples of Counterclaim Defendant's lawsuits against other competitors while alleging that each of the complaints in the actions is "based on fabricated and knowingly false allegations" (*id.* ¶¶ 23-24). *See Hanover*, 806 F.3d at 180 (explaining that there is no minimum number of cases to qualify as a pattern or series when determining what constitutes "sham litigation," but four could qualify as "a series of filings"). Counterclaim Plaintiffs thus assert that Counterclaim Defendant filed numerous suits against third-party sellers in an attempt to "intimidate and harass small businesses such that they would relinquish their right and ability to resell Claritin [p]roducts . . . rather than face the costs of litigation." (*See* Countercls. ¶ 25.)

Counterclaim Plaintiffs further assert that their allegations "[are] not . . . based on 'the mere fact' that [Counterclaim Defendant] filed a slew of similar lawsuits" but rather because "it did so 'not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment.'" (Countercl. Pls.' Opp'n Br. 13 (quoting *Hanover*, 806 F.3d at 180).) In performing a holistic review of the cases presented by Counterclaim Plaintiffs, all four of the filed suits have settled. At the motion to dismiss stage and without the benefit of discovery definitively setting out the universe of cases filed on behalf of Counterclaim Defendant, it is too early to decide whether the series of litigations pursued by

---

[6] Counterclaim Plaintiffs allege that Amazon is one of Counterclaim Defendant's largest customers. (*See* Countercls. ¶¶ 17, 52-54, 70.)

9

Counterclaim Defendant against third parties constitute "sham litigation." So far, Counterclaim Plaintiffs have sufficiently pled claims that fall outside the immunity granted by the *Noerr-Pennington* doctrine, as they alleged both that Counterclaim Defendant had the subjective intent to initiate litigation to stifle competition and that the litigation, as a series of actions, was a sham.[7] In other words, viewed in the light most favorable to Counterclaim Plaintiffs, the Counterclaims plausibly allege that Counterclaim Defendant's filing of suits against third-party sellers was anti-competitive practice, not an exercise of free speech.

Having found that Counterclaim Plaintiffs have alleged sufficient facts to overcome *Noerr-Pennington* immunity at this stage, the Court now evaluates whether the Counterclaims adequately state a claim under Rule 8(a).

B.   **Sherman Act**

In Count One, Sigma asserts that "Bayer has engaged in exclusionary and predatory conduct . . . [, which] has allowed it to maintain its monopoly power, improperly precluding Sigma and other third-party sellers from selling Claritin [p]roducts on online marketplaces" in violation of 15 U.S.C. § 2 of the Sherman Act. (Countercls. ¶ 104.) Bayer argues that Sigma's monopolization claim should be dismissed because it fails to plead: (1) a relevant product market; (2) market power in that market; and (3) antitrust harm. (Countercl. Def.'s Moving Br. 7-8.) Sigma

---

[7] To the extent the parties disagree about whether the lawsuits against third-party sellers were not "sham" litigation and were premised on purported quality control rules and purported illusory warranties that Counterclaim Defendant never enforced or even implemented, the Court finds that it is a factual question that cannot be decided at the motion to dismiss stage. *Takeda Pharm. Co. v. Zydus Pharms. (USA) Inc.*, 358 F. Supp. 3d 389, 394 (D.N.J. 2018) (quoting *FTC v. Shire ViroPharma, Inc.*, No. 17-131, 2018 WL 1401329, at *7 (D. Del. Mar. 20, 2018) ("[W]hether [the] activity [in dispute] was in fact a sham under either standard is a factual inquiry, which cannot be resolved at the motion to dismiss stage."), *aff'd*, 917 F.3d 147 (3d Cir. 2019)); *see also In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, No. 06-52, 2010 WL 1485328, at *10 (D. Del. Apr. 13, 2010) ("The court, however, cannot [determine whether *Noerr-Pennington* applies based on a disputed fact] at the motion to dismiss stage, because it is fact intensive.").

argues generally that it has plausibly stated a monopolization claim under the Sherman Act. (Countercl. Pls.' Opp'n Br. 6-8.)

Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007). To sufficiently plead a monopolization claim under the Sherman Act, Sigma must plead: (1) that Bayer had monopoly power in the relevant market; and (2) that Bayer willfully acquired or maintained monopoly power. *FTC v. AbbVie Inc.*, 976 F.3d 327, 346 (3d Cir. 2020); *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 465-66 (D.N.J. 2023). Further, to recover damages on a Section 2 claim, a plaintiff must also establish that it suffered an "antitrust injury." *Marjam Supply Co. v. Firestone Bldg. Prods. Co.*, No. 11-7119, 2019 WL 1451105, at *6 (D.N.J. Apr. 2, 2019).

### 1. *Whether Bayer Has Monopoly Power in the Relevant Market*

The first element of a Sherman Act Section 2 claim is "the possession of monopoly power *in the relevant market.*" *AbbVie Inc.*, 976 F.3d at 346 (emphasis added). Under Section 2, courts must start by defining the relevant market because, "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) ("*Amex*") (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)); *see also Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) ("[The market definition] analysis is equally applicable to claims made under Section [2] of the Sherman Act, because 'without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition.'" (quoting *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007)); *see also Queen City Pizza Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 435 (3d Cir. 1997) ("[A] plaintiff must identify the relevant

product and geographic markets and allege that the defendant exercises market power within those markets." (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055, 1060 (E.D. Pa. 1996)) (internal quotations omitted)). Accordingly, the Court begins with a discussion of the relevant market.

### a.   The Relevant Product Market[8]

Bayer argues that Sigma's alleged relevant product market is conclusory and that Sigma fails to identify any other products in the market. (Countercl. Def.'s Moving Br. 20.) The Court, however, disagrees.

The relevant market must be a market for particular products or services, the "outer boundaries" of which "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The relevant market includes the product or service at issue as well as its substitutes. *Id.* "However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Id.* The submarket's boundaries "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

"In most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza*, 124 F.3d at 436. As such, courts typically decline to dismiss antitrust claims based on failure to plead the relevant market. *Id.* That

---

[8] Bayer does not dispute that the relevant *geographic* market is the United States (*see* Countercl. Def.'s Moving Br.) and thus the Court will not discuss it.

said, there is no *per se* rule prohibiting dismissal on this basis, and plaintiffs have the burden of defining the relevant market. Dismissal, however, may be appropriate where a plaintiff: "(1) fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand"; or (2) "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Id.* at 436-37 (collecting cases). Accepting the facts underlying Sigma's monopolization Counterclaim as true, the Court asks whether the market underlying Sigma's Counterclaim sis "implausible." *Hanover*, 806 F.3d at 183.

Here, Sigma alleges the relevant product market is the "consumer retail market for loratadine-based allergy medication, *including* those sold under the Claritin brand . . . ." (Countercls. ¶ 71 (emphases added).) This market encompasses products that are reasonably interchangeable with each other based on price and chemical makeup. (*See id.* ¶¶ 71-78.) As such, construing the factual allegations in the light most favorable to Sigma, Sigma has adequately pled that the alleged relevant market is *all* loratadine-based allergy medication, including Claritin, not just the single brand of Claritin. *See Mylan Pharms.*, 838 F.3d at 436-37 (explaining that name-brand and off-brand drugs to treat acne were interchangeable in the relevant product market); *see also Hanover*, 806 F.3d at 183 (holding that, at the motion to dismiss stage, the court could not say that "full-service supermarkets" was an "implausible" product market because the allegation that "full-service supermarkets are distinct from other grocery suppliers because they provide customers with additional amenities" supported the position that "full-service supermarkets encompass[] all interchangeable substitute products").

### b.     Monopoly Power in the Relevant Market

Having found that Sigma has adequately pled a relevant product market, the Court must next determine whether Bayer has monopoly power in that market.

A claim under Section 2 requires a "dangerous probability of [Bayer] achieving monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) (citations omitted). "Monopoly power is the ability to control prices and exclude competition in a given market." *Id.* at 307 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). Whether there is a "dangerous probability" of a defendant obtaining monopoly power depends on several factors: (1) a defendant's market share; (2) its anti-competitive practices; (3) general barriers to entry; (4) strength of competition; (5) probable development of the industry; and (6) the elasticity of consumer demand. *Broadcom Corp.*, 501 F.3d at 318. No single factor is determinative. *Id.* at 319. ("[D]etermining whether a defendant has a 'dangerous probability' of successful monopolization is a fact-sensitive inquiry, in which market share is simply one factor."); *see also Miller Indus. Towing Equip.*, 659 F. Supp. 3d at 466 (explaining that barriers to entry can include regulatory requirements, high capital costs, or technical obstacles that prevent competitors from entering the market).

In the Counterclaims, Sigma alleges that direct and indirect evidence establish that Bayer has monopoly power over the relevant market. (*See generally* Countercls.) First, for direct evidence, Sigma alleges that Bayer has supracompetitive prices in the market that have increased since the start of litigation against third-party sellers. (*Id.* ¶¶ 95-97.) Sigma also alleges that third-party sellers, including itself, were driven from participating in the market and selling on Amazon. (*Id.* ¶¶ 93-94.) Sigma did not, however, provide any cost-analysis of the relevant markets to show direct evidence of an "abnormally high price-cost margin," which is necessary for direct

evidence of monopoly power. *Mylan Pharms.*, 838 F.3d at 434.[9] Second, for indirect evidence, Sigma alleges that Bayer has a dominant share in the market because it controls more than fifty-five percent of the market share in the United States. (Countercls. ¶ 68.)

Although Sigma does not allege that Bayer controls *significantly* more than a fifty-five percent share of the market, Bayer does not contest that it controls a significant portion of the market share. (*See* Countercl. Def.'s Moving Br. 25-26); *Mylan Pharms.*, 838 F.3d at 435; *see also AbbVie Inc.*, 976 F.3d at 371 ("A court can infer market power from a market share significantly greater than [fifty-five] percent."). Sigma also alleges that Bayer created barriers to entry, making third-party sellers unable to sell products, which supports a showing of monopoly power.[10] (Countercls. ¶ 99.) Construing the inferences in the light most favorable to Sigma, the Court finds that Sigma has alleged sufficient facts to plausibly plead that a dangerous probability of Bayer achieving monopoly power in the relevant market exists.

### 2.     *Whether Bayer Willfully Acquired or Maintained Monopoly Power*

The second element of a Sherman Act Section 2 claim is that the defendant willfully acquired or maintained monopoly power. *Broadcom Corp.*, 501 F.3d at 308. "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *Presque Isle Colon & Rectal Surgery v. Highmark Health, Highmark Inc.*, 391 F. Supp. 3d 485, 502 (W.D. Pa. 2019) (internal citations omitted). Conduct must do more than merely harm

---

[9] Sigma does provide images of Amazon product listings that show the costs of different products, however, Sigma does not provide a cost-analysis of products it sells compared to Bayer. (*See* Countercls. ¶ 70.)

[10] For example, Sigma asserts that Bayer has created a set of rules that its authorized sellers must follow. (Countercls. ¶ 26.) But, according to Sigma, "Bayer was (and is) aware that its [a]uthorized [s]ellers do not, in fact, abide by any such rules." (*Id.* ¶ 27.)

competitors; it must harm the competitive process itself. *Broadcom Corp.*, 501 F.3d at 308 (citations omitted); *see also Miller Indus. Towing Equip.*, 659 F. Supp. 3d at 466.

Here, Sigma not only alleges that Bayer has engaged in sham litigation that has harmed Sigma but also alleges that Bayer's litigation harms the market by removing competitors and promoting artificially inflated prices. (Countercls. ¶¶ 17-22.) Sigma asserts that Claritin prices have increased by over eighty percent due to Bayer's anti-competitive conduct. (*Id.* ¶ 97.) In support, the Counterclaims include a chart demonstrating particular Claritin products and sales from April 2017 to July 2024. (*Id.* ¶¶ 91-93.) Sigma alleges that prior to 2022, when numerous third-party sellers offered and sold products on the Claritin listing, the product could be purchased for about $12.27 and as low as $7.60. (*Id.* ¶ 95.) When Bayer began its campaign of purported sham litigations, however, almost no third-party sellers offered products on the Claritin listing, which resulted in the product's price increasing to more than $21.00. (*Id.* ¶¶ 96-97.) As such, the Court finds that Sigma has sufficiently alleged plausible indications of harm to the process of competition by Bayer. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *see also Radio Music License Comm., Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 502 (E.D. Pa. 2014) ("The most common characteristics of unlawful monopolies are price increases, output decreases, and a deterioration in quality and service, all of which the antitrust laws seek to minimize.").

   3. ***Whether Sigma Sufficiently Pleads Antitrust Injury and Causal Connection***

To recover damages on a Section 2 claim, Sigma must also prove it suffered an "antitrust injury." *Marjam Supply Co.*, 2019 WL 1451105, at *6. Antitrust injuries have three elements: (1) an injury-in-fact; (2) that has been caused by the Sherman Act's violation; and (3) that is the

type of injury contemplated by the Sherman Act. *Id.* (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Third Circuit requires that an allegation of antitrust injury reflect the challenged activity's anti-competitive effect on the competitive market and that the allegedly anti-competitive conduct harmed the competitive landscape and not just Sigma. *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, No. 03-232, 2004 WL 1427136, at *7 (E.D. Pa. Jun. 21, 2004). Further, the Third Circuit has "consistently held that an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered injury unless the activity has a wider impact on the competitive market." *Id.* at *7 (citing *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001)). Thus, litigation costs alone do not qualify as antitrust injury without some allegation that said expenses incurred in defending "sham" litigation had any effect on competition, on the price, quantity or quality of Sigma's products, or prevented Sigma from pursuing its entry into the market. *Miller Indus. Towing Equip.*, 659 F. Supp. 3d at 468.

Here, Sigma alleges that it suffers litigation costs from the alleged sham litigation, exclusion from entry into the market, and economic injury. (Countercls. ¶¶ 86, 101, 110.) Because the facts underlying Sigma's monopolization claim suggest that Bayer's conduct has had an effect on competition, on the price, and on Sigma's ability to enter the market, the Court finds that Sigma has sufficiently pled antitrust harm. *Miller Indus. Towing Equip.*, 659 F. Supp. 3d at 468 ("[L]itigation costs alone do not qualify as antitrust injury without some allegation that said expenses incurred in defending 'sham' litigation had any effect on competition, on the price, quantity[,] or quality of [d]efendant's products, or prevented [d]efendant from pursuing its entry into the market."). The Court, therefore, finds that Sigma has sufficiently stated a monopolization claim against Bayer. Accordingly, the Court denies Bayer's motion as it pertains to Count One.

C.  **New Jersey Antitrust Act (N.J. Stat. Ann. § 56:9-1)**

In Count Two, Sigma asserts a monopolization claim under the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1, against Bayer. (Countercls. ¶¶ 115-22.) Because the Court has found that Sigma has adequately pled a monopolization claim under Section 2 of the Sherman Act, Sigma has also sufficiently pled a claim under the New Jersey Antitrust Act. *See* N.J. Stat. Ann. § 56:9-18 (explaining that the New Jersey Antitrust Act must "be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes"); *see also St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 n.2 (3d Cir. 2009) (New Jersey "state law antitrust claims are only viable if the corresponding federal claims are sufficient."). Accordingly, the Court denies Bayer's motion as it pertains to Count Two.

D.  **Tortious Interference with Prospective Economic Advantage**

In Count Three, Schiff asserts a tortious interference with prospective economic advantage claim as to Bayer. (Countercls. ¶¶ 123-32.) More specifically, Schiff alleges that he was denied a loan needed to participate in an investment opportunity due to this litigation. (*Id.* ¶¶ 130-31.)

Bayer argues that Schiff's claim fails because he fails to: (1) identify a reasonable expectation of economic advantage; (2) allege Bayer's knowledge of the economic opportunity; and (3) allege causation of harm. (Countercl. Def.'s Moving Br. 29-30.) Schiff counters that he sufficiently pled the denied loan as a qualifying economic advantage that also caused harm. (Countercl. Pls.' Opp'n Br. 26-29.)

"Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 38 (N.J. 1989) (citation omitted). Under New Jersey law, to set forth a tortious interference with prospective economic advantage claim, a plaintiff must

adequately allege: (1) a "reasonable expectation of economic advantage" from a business relationship; (2) interference "done intentionally and with malice," which means "the harm was inflicted intentionally and without justification or excuse"; (3) "the interference caused the loss of the prospective gain"; and (4) damages as a result of the loss. *Id.* at 37 (internal quotation marks omitted).

Here, Schiff alleges that he had a reasonable expectation of an economic benefit—a loan and an investment opportunity. (Countercls. ¶¶ 129-30.) Schiff, however, fails to provide any details surrounding this purported loan and investment opportunity. (*See generally id.*) Rather, Schiff, in a conclusory manner, alleges that he was denied the ability to obtain a loan to participate in an investment opportunity because of this "sham litigation." (*Id.* ¶¶ 129-31.) Without more, the Court is unable to conclude that the instant case caused Schiff's inability to obtain the loan and participate in this investment opportunity. *Hong Kong Ibesttouch Tech. Co. v. iDistribute LLC*, No. 17-2441, 2018 WL 2427128, at *4 (D.N.J. May 30, 2018) ("Simply stating that it will lose prospective customers is insufficient [to sustain a tortious interference claim under Rule 8(a).]").

Second, Schiff fails to allege that Bayer was aware of this purported loan and the investment opportunity. *See Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998) (rejecting defendant's tortious interference with prospective economic advantage claim because defendant was not on notice of potential economic transactions and benefits). As the allegations underlying Schiff's tortious interference claim currently stand, they fail to rise to the level of more than a mere hope of economic gain, which is insufficient to sustain a tortious interference claim. *iDistribute*, 2018 WL 2427128, at *4 ("[A plaintiff] must allege additional facts to support its allegation that [defendant] had knowledge of [plaintiff]'s prospective contracts or current customers."). Schiff has not alleged Bayer's knowledge, and in turn, he has

not alleged malice on Bayer's part. *See 22nd Century Tech., Inc. v. Creative Sys. & Consulting*, No. 22-3224, 2023 WL 2644448, at *4 (D.N.J. Mar. 27, 2023) (explaining that a plaintiff must allege malice for a tortious interference claim, or "that the harm was inflicted intentionally and without justification or excuse"); *see contra Fora Fin. Holdings, LLC v. Dream Data Servs., LLC*, No. 23-780, 2023 WL 6049835, at *6 (D.N.J. Sept. 15, 2023) (explaining that plaintiff's vague allegations based on unknown, prospective customers and business relationships that may be lost cannot withstand a motion to dismiss).

As such, the Court finds that Schiff fails to state a claim for tortious interference with a prospective economic benefit. Accordingly, Bayer's motion to dismiss as to Count Three is granted.[11]

## IV. CONCLUSION

For the reasons set forth above, Counterclaim Defendant's Motion to Dismiss is granted in part and denied in part. The Court will issue an Order consistent with this Memorandum Opinion.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[11] Because Schiff may be able to cure this defect, the Court dismisses the claim without prejudice.